COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-253-CV

IN THE INTEREST OF S.A., Z.A.,

AND S.A.,
(footnote: 1) CHILDREN

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 2)

------------

I. Introduction

Appellants Emily and Michael, mother and father of S.A., Z.A., and S.G., appeal the trial court’s order terminating their parental rights to their children.  Emily raises five issues challenging the factual sufficiency of the evidence to support the trial court’s findings that (1) termination was in the children’s best interest, (2) she exposed the children to environmental endangerment, (3) her course of conduct endangered the children, (4) she constructively abandoned the children, and (5) the Texas Department of Family and Protective Services (referred to herein as “TDFPS,” “the Department,” or “CPS”) made reasonable efforts to return the children to her.  Michael raises four issues, which correspond to Emily’s first four issues.  We will affirm.

II.  Factual and Procedural Background

Emily and Michael have been in a relationship together for nine years.  During that time, the couple had three children:  S.A. was born September 7, 2001; Z.A. was born December 23, 2002; and S.G. was born December 23, 2004.  However, because Emily and Michael’s relationship was marked by numerous changes in their residence, fighting, criminal activity, and drug use, the Department removed their three children.  Emily’s and Michael’s specific conduct is detailed below, along with the conduct of the children’s grandparents because the grandparents were considered for placement of the children.

A. Emily’s Conduct

At trial, Emily recounted the places that she had lived in the past and said that she could have lived at as many as five different places in the last year.  She said that she is currently staying with a friend in Fort Worth and has been there since Michael went to jail on May 21, 2006.  Emily’s mother, Judy, testified that her daughter frequently lives with her following fights with Michael. 

With regard to her relationship with Michael, Emily said that there were only “a few occasions” when their arguments were “really physical.”  She described an incident that occurred in 1999 in which Michael ended up in jail for assaulting her.  Emily said that Michael went to jail in 2000 after a stabbing incident that occurred while he was under the influence of alcohol; later in her testimony, Emily admitted that she had stabbed Michael because he had been out all night and had said mean things to her.  Emily said that in April 2006, she pushed Michael, tackled him to the ground, and took his money.  Emily subsequently had to get a leg brace because she injured her knee when she tackled Michael.  Overall, Emily admitted to hitting Michael three times, but she said that she had never been arrested for assault/family violence.
(footnote: 3)  Judy said that she would characterize Emily and Michael’s relationship as violent and stated that she had observed Emily hit Michael on more than one occasion. 

S.A. was nine months old when she ingested methadone and was removed from Emily’s care.  Emily testified that she was at a neighbor’s house on the phone with her grandfather and that although S.A. was in her care at that time, she did not know that S.A. had ingested methadone. 

Emily testified that CPS removed Z.A. from her on May 8, 2003.  However, she did not explain the circumstances surrounding his removal. 

With regard to S.G., Emily said that she was living with her parents after Michael went to jail.  Emily’s parents brought S.G. home from the hospital after she was born.  Ultimately, Emily’s parents asked her and Michael to leave the house.  After Emily and Michael moved out, Judy found crack pipes and a crack spoon in their room.  Emily said that CPS removed S.G. from her care on July 8, 2005. 

Officer Chris West of the City of Bedford Police Department testified that he was dispatched on July 8, 2005 to a forgery in progress that involved Emily and Michael.  When he arrived, Michael, Emily’s brother, and S.G. were in a car parked in front of a business, and Emily was inside trying to pass a forged check.  A search of the car revealed forged checks, narcotics, and drug paraphernalia.  Specifically, police found a glass pipe in Emily’s brother’s pocket; a bag with methamphetamine in Emily’s purse; a black sunglasses case on the passenger-side floorboard containing two syringes; a Ziplock bag containing what appeared to be methamphetamine residue; another pipe used for smoking methamphetamine; a digital scale; and a firebox containing several passport-type photos of Michael and a checkbook belonging to a man in Grapevine.  As a result of this incident, police charged Emily’s brother and Michael with forgery and charged Emily with forgery and possession of a controlled substance of less than one gram.  Thereafter, all three adults were placed in jail, and Officer West called CPS to get S.G.  Emily testified, however, that the forgery charge had since been dropped. 

With regard to Emily’s drug use, she testified that when CPS removed S.A., she was not using drugs because she was pregnant.  Emily admitted that she had smoked marijuana while she was pregnant with Z.A., but said that was before she had learned that she was pregnant.  She said that she had undergone outpatient drug rehabilitation at a MHMR clinic after she was charged with fraud for altering the number of pills on a Xanax prescription.  Emily also said that she had used methamphetamine and that the last time that she had used it was on November 7, 2005, when Michael went to rehab.  Emily said that she had relapsed on drugs “off and on” since S.G. was taken from her.  Specifically, Emily testified that she had overdosed on cocaine in April 2006.  She said that this was her first experience with cocaine, and that it had been laced with PCP.  Emily admitted that she had been diagnosed with substance abuse issues and that she has a continuing drug problem.
(footnote: 4) 

Emily testified that she is bipolar, manic/depressive.  Emily’s pertinent past medical history includes head trauma, a history of physical abuse, schizophrenia, and psychosis.  She said that she is taking Zoloft, Seroquel, and Clonopin for her bipolar disorder.
(footnote: 5)  She said that she does not take her medications every day because she sometimes forgets.  She admitted that she had been taking prescription medications while she also was using illegal drugs.

Because of Emily’s drug addiction, she has never had all three children in her possession at the same time.  She also said that none of the children have come back to her home since they were removed. 

B. Michael’s Conduct

Michael admitted that during the last year, he had lived in four residences.  Michael said that he moved frequently because he likes to move and he did not have possession of the kids.  He said that he never had a stable environment growing up and that as a child he lived with lots of different family members because he was a problem child.
(footnote: 6) 

Michael admitted that he and Emily fight.  However, he said that he was not the aggressor in any of the fights.  He said that Emily’s testimony about their April 2006 fight was not true; Michael claimed that the last time he had a physical altercation with Emily was seven or eight years ago when Emily stabbed him because he had brought some women home.  He said that S.A. was at Emily’s mother’s house when the stabbing occurred and said that he and Emily did not fight while S.A. was in their care; instead, he left if Emily became upset.  Michael also testified that he had been jailed once before the stabbing incident when he bruised Emily’s arms by holding her down to keep her from hitting him. 

Michael admitted that he hates the police and that he acts violently toward them.  He denied having an anger problem, however, and said that he has been through anger management classes twice. 

With regard to his drug use, Michael testified that he had been using drugs since he was fourteen years old; he is now thirty-four years old.  He admitted that he had used “any and everything” that could get him high.  He said that he would buy drugs and get high like people buy alcohol; he believes that because he earns his money, he has a right to do with it what he wants.  He admitted that his dad and stepmother, Bobby A. and Janet, had sent him to rehab when he was seventeen years old and that he had been to rehab a total of five times.  He stated that his last full-time recreational drug use was in November 2005, and then he went to rehab for thirty days in 2005 and successfully completed the program.  Michael admitted that he had relapsed in February 2006 by using cocaine and drinking alcohol.
(footnote: 7)  He stated that he does not consider his drug use an addiction; instead, he just considers it “normal for [him].”  Michael testified that he does not currently have a drug problem.
(footnote: 8)  He explained that it is his intention to go to church, not Narcotics Anonymous or Alcoholics Anonymous, because he gets better results from church. 

Michael testified that Emily’s drug use is not a major problem.  He thinks it is okay for parents to use drugs when they have custody of their kids and that, in the past, he did not think that a parent’s drug use could put kids in danger because he was raised that way.  Now, however, because he has been to rehab, he no longer believes that drug use is okay. 

With regard to his mental health, Michael testified that he takes Seroquel and Zoloft, but that he had not been diagnosed as bipolar. 

With regard to his criminal history, Michael explained the forgery event in 2005 by saying that Emily had a money order, not a forged check, and that she was cashing it for her brother.  He said that the drug-related items that the police found in the car were fake and that is why the case was dropped.  Michael testified that he had been on probation for the misdemeanor offense of domestic violence, and he had four misdemeanor convictions for driving while intoxicated. 

C. Grandparents’ Conduct

1. Maternal Grandparents

Judy, who is married to Bobby G., testified that she had back surgery in 2003.  She explained that she takes up to six Vicodin (hydrocodone) tablets a day and up to three Soma per day, a muscle relaxer.  Judy said that she had purchased about 1,080 pills during the past year and has about 60 hydrocodone pills at her house.  She stated that she requires hydrocodone or Soma for her back pain approximately three or four times a week.  Judy was having surgery the day following the termination trial to help control the pain in her back and reduce the number of pain pills that she requires.  She said that she is also taking Nexium, Prednisone, Ambien, and Effexor, which her psychiatrist prescribed for depression after her mother died.  Judy said that she keeps her medications locked in a lockbox.  She said that she would consent to a drug review. 

Judy admitted that she was on probation in 1999 for providing alcohol to a minor.  She also admitted that she and Emily both smoke.  

Judy said that she had taken care of S.G. “all day[,] every day” since S.G. was born.  However, Michael testified that Emily was taking care of S.G. the majority of the time that the couple lived with Emily’s parents.  

2. Paternal Grandparents

Bobby A., Michael’s father, testified that S.A. came to live with him and his wife, Janet, in August 2001 and that Z.A. arrived at their house in May 2002.  Bobby A. testified that Z.A. was diagnosed with Type I diabetes in December 2004.  Bobby A. and Janet are very concerned about Z.A. and her care; they found a church member who is a registered nurse from Cook Children’s Hospital to take care of Z.A. during the trial. 

Bobby A. admitted that police raided his house in June 2005.  During the raid, police found drugs on his son’s girlfriend who was at the house and found drugs in areas of the house inhabited by their son.  Bobby A. also admitted that he, Janet, S.A., and Z.A. all tested positive for methamphetamine after S.A. and Z.A. were removed from he and Janet’s care following the drug raid.  Bobby A. speculated that over-the-counter medications that they were taking for illnesses could have made the test positive.  Bobby A. testified that he has never used illegal drugs and that he does not know why Janet used marijuana in May 2005 at age forty-six or forty-seven.  

Bobby A. testified that he had allowed S.A. and Z.A. to be in the company of his sons even though his sons have criminal records.  He also testified that he would continue to allow Michael and Emily to see their children at barbeques and family gatherings if Michael and Emily were drug free.  Bobby A. said that he would also allow Emily’s parents to see the children at barbeques and family gatherings.  Bobby A. said that he will watch S.A. and Z.A. more closely than he did his own sons for signs of drug use. 

Janet testified that she has been married to Bobby A. for twenty-seven years and that Michael is her stepson.  She testified that Bobby A. is a service technician for General Electric Company and that he has been with the company for twenty-eight years.  She said that he makes approximately $68,000 a year and that she stays at home to care for S.A. and Z.A.  

Janet admitted that she had used marijuana in May 2005 and while she was a teenager.  Janet believed that she, Bobby A., S.A. and Z.A. tested positive for methamphetamine after S.A. and Z.A. were removed because the drug was in the air vents or that test results were bogus; she claimed that the lab that conducted the test was not accredited by the Food and Drug Administration.  Because all of Janet’s subsequent hair follicle and urine tests were negative, and because Bobby A.’s were likewise negative, Janet believed the positive methamphetamine tests had to have been erroneous.  She testified that she has not ingested any illegal substances or prescription drugs (other than those prescribed directly for her) since May 30, 2005.  Janet also pointed out that none of her drug evaluations tested positive for marijuana.
(footnote: 9) 

Janet explained that she and Bobby A. did not originally request that S.G. be placed with them because they did not have a relationship with her.  Janet testified, however, that since then, she has had contact with S.G. when she brings S.A. and Z.A. to visits but was denied further visitation with S.G. by court order. 

D. CASA Volunteer’s Observations

Paula Phillips, the Court Appointed Special Advocate (“CASA”) assigned to the case, testified regarding her interactions with Emily, Michael, the children, and the grandparents.  Phillips testified that she had been to Emily’s parents’ house and that it is clean and that the room for S.G. is appropriate.  Phillips said that there is no indication that Emily’s parents engaged in illegal drug use.  

Phillips testified that during her second visit to Emily’s parents’ house, Emily was there.  Emily told Phillips that she had outstanding warrants for her arrest for the offense of theft by check.  Emily mentioned a drug overdose and talked about the violence between her and Michael.  Phillips learned that a week earlier, Emily had overdosed on medications and had gone to John Peter Smith Hospital to get her stomach pumped.  Emily mentioned stabbing Michael and said that she and Michael had fought a lot over their nine years together. 

After visiting with Emily’s parents, Phillips took Emily to the motel where she and Michael were living.  When Michael opened the door, he had a crack pipe in his hand and went to go hide it,
(footnote: 10) and Phillips noted the smell of chemicals.  Phillips testified that the motel where Emily and Michael were staying was sleazy, filthy and not a place for children. 

During the one CPS visit between Emily and the children that Phillips observed, Emily arrived late and missed visiting with S.G.  To Phillips, it did not appear that Emily was bonded with the children, and Emily said several times that she did not know how to bond with S.A. and Z.A.  When Phillips told Emily how to play with the children, Emily started crying and said that she did not know how.  

Phillips said that Bobby A. and Janet had very good interaction with the children, that they engaged in activities with the children, and took them places.  Phillips testified that a bond exists between the grandparents and the
 
children.  Although Bobby A. and Janet’s three boys are over age twenty and are now all incarcerated, S.A. and Z.A. were removed from Bobby A. and Janet’s home because one of the sons had an illegal substance that was found within a child’s reach.  Phillips noted that neither Bobby A. nor Janet were arrested or charged when the drugs were found in their house.  S.A. and Z.A. subsequently tested positive for methamphetamine.

Bobby A. told Phillips that he does not do drugs and that he is subject to random drug testing because he drives a company vehicle.  But Janet admitted to smoking a joint in 2005 while she was at a party.  Finally, Phillips believed that whatever Bobby A.’s and Janet’s past, they have straightened out for the sake of their grandchildren.  

With regard to the Kennemores, who are relatives from Missouri who seek to have S.G. placed with them, Phillips stated that she had no concerns with the placement of S.G. with them.  

E. Compliance with Service Plan

1. S.G.’s Caseworker’s Synopsis of Compliance

Mary Jokisch, the CPS caseworker assigned to S.G.’s case, testified that she discussed the service plan with Emily and Michael in early August 2005 and gave them a copy.  Jokisch said that the service plan required Emily and Michael to undergo psychological evaluations, to attend parenting classes, to submit to drug and alcohol assessments, and to attend individual counseling.  Jokisch stated that although she made appointments for Emily and Michael and that the Department was paying for the classes, Emily and Michael did not accomplish anything on the plan. 

Specifically, Jokisch said that she asked Emily and Michael to take a urinalysis on August 8 and October 7, but neither took the test.  Emily and Michael told her that they could not find the place to give the urinalyses even though Jokisch had given them the address and a map.  Additionally, Emily had told Jokisch that she would not go to the first urinalysis because it would come back dirty because she had been around people who were doing drugs.  Jokisch’s records also revealed that Emily and Michael did not show up for three of their psychological appointments. 

Jokisch admitted that transportation was an issue for Emily and Michael because they did not own a car, but she said that Emily had told her that Emily’s parents would assist them.  Additionally, Jokisch said that CPS does not traditionally transport parents.  Jokisch noted that Emily was able to get transportation to the visits with her children but not to the services that she was required to complete. 

With regard to CPS’s review of placing S.A. and Z.A. with Bobby A. and Janet, Jokisch testified regarding the facts surrounding the removal of S.A. and Z.A. from Bobby A. and Janet’s home following the drug raid.  Jokisch testified that hair follicle testing was done within a matter of days or weeks after the children were removed and that all four people—Bobby A., Janet, S.A., and Z.A.—tested positive for methamphetamine.  Jokisch said that Bobby A. and Janet later tested negative for methamphetamine shortly after the test that was positive and that all of their other drug tests were negative. 

With regard to CPS’s review of placing S.G. with Emily’s parents, Jokisch testified that the recommendation on Emily’s parents’ home study was denied because Judy was taking pain medications and was not following through with recommendations, including family therapy.  Therefore, CPS was considering Missouri relatives, the Kennemores, for S.G.’s placement. 

2. Ongoing Caseworker’s Synopsis of Compliance

Heather Jones, the ongoing caseworker for Emily and Michael’s children, testified that Emily “was pretty compliant with her visits” and “took a couple of drug tests.”  Jones said that Michael came to four or five of the forty scheduled visits and took one drug test that was court-ordered.  Jones stated that court-ordered drug tests for Emily and Michael both came back dirty; Emily’s was positive for methamphetamine and amphetamine, and Michael’s was positive for methamphetamine.  During a three-month period, Emily and Michael attended only two counseling sessions. 

With regard to transportation, Emily told Jones that she would be moving to Fort Worth and that transportation then would not be a problem.  Jones testified that Emily eventually did move to Fort Worth and lived there long enough to complete her service plan.  Jones stated that it was up to Emily to schedule her services and that they had provided her with all the phone numbers. 

Jones testified that Michael had held a job.  Jones said that Michael had completed a parenting program in a prior case, as well as anger management classes, and he had been frequently tested for drugs through the probation department.  However, she said that there was no proof either way regarding whether he was clean and sober right now.  Jones gave her opinion regarding how often Michael had moved and said that she thinks it is inappropriate for people to move as often as he does.  

With regard to placement of the children with Bobby A. and Janet, Jones testified that there are no current concerns about drug use in that home because Bobby A. and Janet have tested negative every time following the initial drug test after S.A. and Z.A. were removed.  She stated that Bobby A. has had a full-time job and was able to complete his service plan in six weeks.  Janet also had completed the service plan in six weeks, which included a drug and alcohol evaluation. 

With regard to Emily’s parents’ home study, Jones testified that there were concerns regarding Judy’s prescription medications, whether she would be able to stand up to Emily, and why she did not complete a drug assessment or family therapy.  Jones stated that she had asked Judy to take a hair follicle test, but she never received documentation showing whether the test was performed. Jones admitted that she had never made a formal request that Judy submit to a  drug assessment.  Jones had also requested that Judy provide her a list of the medications that she was taking and the reason that they were prescribed to her, but Jones never received such list.  However, based on the number of pills that Judy possessed, she was concerned about placing S.G. with Judy. 

3. Emily’s and Michael’s Synopses of Their Compliance

Emily testified that she had received a service plan for S.A. and had completed it.  She explained that she made all of the scheduled visits and that they went “quite well.”  She said that she and her mother had attended counseling.  She said that she had difficulty arranging transportation to Dallas for her service plan and that she had talked to Jones about her problems with transportation.  Emily admitted that several of her drug tests had come back positive for controlled substances.  She also admitted that the doctor had told her to go to Narcotics Anonymous and Alcoholics Anonymous, but she had not done so.  

Michael acknowledged that he had received a service plan, but he said that “[i]t asked quite a bit of [him], more than it’s probably normal for a human being to do and go to work.”  He said that he and Emily are not trying to get their children back and that they gave up their children because they knew that they were not financially capable of caring for them.  However, he said that they had completed the entire service plan anyway.  Thereafter, he said that he had not completed the service plan for S.G. and that he had not received a service plan for S.G.; he thought Emily had received the service plan for S.G.  He said that he had five to seven visits with S.G. and that Emily had visited S.G. every week.  He said that CPS had set up classes in Dallas knowing that they did not have a vehicle and that CPS had set up parenting classes that he and Emily did not have money to pay for.  Therefore, he felt that he had been sabotaged by CPS. 

F. Disposition

After hearing the above evidence, the trial court entered an order terminating Emily’s and Michael’s parental rights and placing all three children with Bobby A. and Janet.  This appeal followed.

III.  Burden of Proof and Standard of Review

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, TDFPS must establish one or more of the acts or omissions enumerated under subdivision (1) of the statute and must also prove that termination is in the best interest of the child.  
Tex. Fam. Code Ann.
 § 161.001 (Vernon Supp. 2006);
 In re J.L.
, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  
Tex. Dep't of Human Servs. v. Boyd
, 727 S.W.2d 531, 533 (Tex. 1987).  Because of the elevated status of parental rights, the quantum of proof required in a termination proceeding is elevated from the preponderance of the evidence to clear and convincing evidence.  
Santosky v. Kramer
, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); 
see also
 
Tex. Fam. Code Ann.
 § 161.001.

The higher burden of proof in termination cases alters the appellate standard for both legal and factual sufficiency reviews.  
In re J.F.C., 
96 S.W.3d 256, 265 (Tex. 2002); 
In re C.H.
, 89 S.W.3d 17, 25 (Tex. 2002); 
In re J.T.G.
, 121 S.W.3d 117, 124 (Tex. App.—Fort Worth 2003, no pet.).  Both legal and factual sufficiency reviews in termination cases must take into consideration whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the matter on which TDFPS bears the burden of proof.  
J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124.  

Accordingly, in determining a factual sufficiency issue, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing and then determine whether, based on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001 and that the termination of his or her parental rights would be in the child’s best interest.  
Tex. Fam. Code Ann.
 § 161.001; 
C.H.
, 89 S.W.3d at 25.  In reviewing the factual sufficiency of the evidence, we must consider all the evidence in the record, both that in support of and contrary to the trial court’s findings.  
C.H.
, 89 S.W.3d at 27-29.  Additionally, we must consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding.  
J.F.C.
, 96 S.W.3d at 266.  If the disputed evidence is of such magnitude that a trier of fact could not reasonably have formed a firm belief or conviction that its finding was true, then the evidence is factually insufficient.  
Id
. 

IV.  Factually Sufficient Evidence Regarding Endangering 

Course of Conduct

In their second and third issues, both Emily and Michael argue that the evidence is factually insufficient to establish that they endangered their children.  TDFPS argues that there is ample evidence to support the trial court’s endangerment findings under sections 161.001(1)(D) and (E) of the family code. 

Endangerment means to expose to loss or injury, to jeopardize.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125; 
see also In re M.C.
, 917 S.W.2d 268, 269 (Tex. 1996).  To prove endangerment under subsection (D), TDFPS had to prove that Emily and Michael (1) knowingly (2) placed or allowed their children to remain (3) in conditions or surroundings that endangered their physical or emotional well-being.  
See
 
Tex. Fam. Code Ann. 
§ 161.001(1)(D).  Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the children’s physical well-being was the direct result of Emily’s and Michael’s conduct, including acts, omissions, or failures to act.  
J.T.G.
, 121 S.W.3d at 125; 
see
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).  Additionally, termination under section 161.001(1)(E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.  
J.T.G.
, 121 S.W.3d at 125; 
see
 
Tex. Fam. Code Ann.
 § 161.001(1)(E).  However, it is not necessary that the parent’s conduct be directed at the children or that the children actually suffer injury.  
Boyd
, 727 S.W.2d at 533; 
J.T.G.
, 121 S.W.3d at 125.  The specific danger to the children’s well-being may be inferred from parental misconduct standing alone.  
Boyd
, 727 S.W.2d at 533; 
In re R.W.
, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children’s birth.  
In re D.M.
, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

Stability and permanence are paramount in the upbringing of children.  
See In re T.D.C.
, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied).  A fact-finder may infer from past conduct endangering the well-being of the children that similar conduct will recur if the children are returned to the parent.  
See In re D.L.N.
, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied), 
disapproved on other grounds by
 
J.F.C.
, 96 S.W.3d at 256, and 
C.H.
, 89 S.W.3d at 17.  Drug use and its effect on a parent’s life and her ability to parent may establish an endangering course of conduct.  
Dupree v. Tex. Dep’t of Protective & Regulatory Servs.
, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ).

Evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child’s well-being.  
J.T.G.
, 121 S.W.3d at 133.  While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment.  
Boyd
, 727 S.W.2d at 533-34; 
R.W.
, 129 S.W.3d at 743-44
.

The record contains substantial evidence of subsection (D) environmental endangerment and subsection (E) course of conduct endangerment to the physical or emotional well-being of the children.  Because the evidence concerning these two statutory grounds for termination is interrelated, we consolidate our examination of it.  
See J.T.G.
, 121 S.W.3d at 126.

The record demonstrates that Emily suffered from bipolar disorder and had a history of illegal drug use, including during one of her pregnancies.  Emily admitted that she had used marijuana while she was pregnant with Z.A.  Although Emily did not admit to using drugs while she was pregnant with S.A., CPS removed S.A. after she ingested methadone while she was with Emily at a neighbor’s house.  Emily also testified that she had used methamphetamine and that she had overdosed on crack cocaine laced with PCP.  Emily also admitted that she takes prescription medications along with illegal drugs.  She was still struggling with her drug addiction at the time of the termination trial and planned to check herself into rehab.

In addition to her drug addiction, the record reveals that Emily exhibited a pattern of uncontrolled anger that often resulted in her infliction of physical harm upon Michael.  Michael testified regarding Emily’s stabbing him, tackling him, and hitting him.  Emily’s mother confirmed that she had seen Emily hit Michael and described Emily and Michael’s relationship as “violent.”  

In addition to the emotional instability exhibited by Emily, she also exhibited instability in her living arrangements by testifying that she could have lived five places in the last year, and the motel room where she and Michael were living when they were visited by the CASA volunteer was filthy and in a bad part of town.

The record also shows that Emily has a criminal history.  She was arrested for forgery, possession of a controlled substance, and prescription fraud.

The record reveals that, like Emily, Michael had a history of illegal drug use, lived in multiple places, and had a criminal history.  Michael admitted that he had been doing drugs for twenty years and that he used “any and everything” that would get him high.  He stated that he had been to rehab five times, but he still relapses with drugs and alcohol.  He said that doing drugs is normal for him and is not an addiction.

The record demonstrates that Michael liked to move and that he did not want to live anywhere for more than six months.  As noted above, he was living with Emily in the filthy motel room that was located in an unsafe part of town.

The record reveals that Michael had an extensive criminal history and that he was in jail at the time of the termination trial.  He admitted to having been on probation for domestic violence and being charged with misdemeanor driving while intoxicated on four occasions.  When he was arrested for forgery, he was in the car with S.G. and drug paraphernalia.  Although Michael testified that he was not the aggressor during the physical fights with Emily and did not get violent around her, he admitted that he gets violent toward the police and had been to anger management classes.

Both Emily and Michael argue that their children were endangered by other people’s drug use, that they never fought around the children, and that it was acceptable for them to move frequently because their children were not living with them.  However, endangering acts need not be directed at the children or cause actual injury or threat of injury to the children, and 
as mentioned above, endangerment may include what parents do both before and after the birth of a child.  
In re U.P.
, 105 S.W.3d 222, 233-34 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); 
see also D.M.
, 58 S.W.3d at 812.

We have carefully reviewed the entire record.  Giving due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing, we hold that a reasonable trier of fact could have formed a firm belief or conviction that 
Emily and Michael knowingly placed S.A., Z.A., and S.G. in conditions and engaged in conduct that endangered the children’s physical or emotional well-being.  
See 
Tex. Fam. Code Ann.
 § 161.001(1)(D), (E);
 J.F.C.
, 96 S.W.3d at 265-66; 
C.H.
, 89 S.W.3d at 25; 
J.T.G.
, 121 S.W.3d at 124; 
In re T.J.
, No. 02-05-00353-CV, 2006 WL 820518, at *6 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op.) (holding that mother’s and father’s criminal history and illegal drug use provided sufficient basis to establish environmental endangerment and course of conduct endangerment).
  Accordingly, we hold that the evidence is 
factually sufficient to support the trial court’s finding on environmental endangerment and course of conduct endangerment.  We overrule Emily’s second and third issues and Michael’s second and third issues.

Emily and Michael also challenge the factual sufficiency of other statutory grounds for termination that were alleged by TDFPS
. 
 
Only one finding under section 161.001(1) is necessary, however, to support a judgment of termination.
  Tex. Fam. Code Ann.
 § 161.001(1); 
In re J.J.O.
, 131 S.W.3d 618, 630 (Tex. App.—Fort Worth 2004, no pet.); 
see also Tex. Dep’t of Human Servs. v. E.B.
, 802 S.W.2d 647, 649 (Tex. 1990) (op. on reh’g).  Accordingly, because we have held that factually sufficient evidence exists to support the trial court’s finding under family code section 161.001(1)(D) and (E), we need not address Emily’s and Michael’s fourth issues.  
See
 
Tex. Fam. Code Ann.
 

§ 161.001(1); 
Tex. R. App. P.
 47.1; 
J.J.O.
, 131 S.W.3d at 630.

V.  CPS Made Reasonable Efforts To Return The Children To Emily

In her fifth issue, Emily argues that the evidence is factually insufficient to support a finding that CPS made reasonable efforts to return the children to her.  To the contrary, the evidence reveals that TDFPS prepared several service plans that were designed to help Emily; however, she failed to complete them.  Although Emily was supposed to schedule her own appointments for the services, the record shows that S.G.’s case worker attempted to help Emily comply with her service plan by making appointments for her drug referral and individual counseling.  Emily, however, chose not to find transportation to these services even though she was able to find transportation to the visits with S.G. every week.  Emily also chose not to attend visits with S.A. and Z.A. for over two years.  Throughout the time that CPS attempted to reunite Emily with her children by providing her with the phone numbers and addresses of services that would help her, Emily refused to comply with the service plan and instead continued using illegal drugs, engaging in criminal activity, fighting with Michael, changing residences, and remaining unemployed.  In light of these circumstances, Emily concedes that she is not in a position to care for her children; yet, she still believes that CPS should have returned her children to her.  

Having reviewed the entire record, we conclude that Emily’s noncompliance with the service plans prevented the children from being reunited with her, despite the Department’s best efforts otherwise.  Therefore, we hold that a fact-finder could reasonably form a firm belief that under these circumstances, the Department made reasonable efforts to reunite the children with Emily.  
See
 
Tex. Fam. Code Ann.
 § 161.001(1)(N)(I);  
In re K.M.B.
, 91 S.W.3d 18, 25 (Tex. App.—Fort Worth 2002, no pet.) (holding that State showed that it made reasonable efforts to return child to mother but mother did not complete service plans).  We overrule Emily’s fifth issue.

VI.  Termination Was In The Children’s Best Interest

In their first issue, both Emily and Michael argue that the evidence is factually insufficient to support the trial court’s finding that termination of their parental rights was in the children’s best interest.  TDFPS argues that there is ample evidence to support the trial court’s “best interest” finding.
 

A strong presumption exists that the best interest of a child is served by maintaining the custody of a parent.  
In re W.E.C.
, 110 S.W.3d 231, 240 (Tex. App.—Fort Worth 2003, no pet.).  The fact-finder may consider a number of factors in determining the best interest of the child, including the following:  (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent.
  Holley v. Adams
, 544 S.W.2d 367, 371-72 (Tex. 1976).  Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  
C.H.
, 89 S.W.3d at 27.

Regarding the first factor, the children did not testify at trial, but S.A. told her counselor on two occasions that she did not want to live with Emily and that she feared being taken from “Memaw.”  Testimony from Phillips, the CASA volunteer, revealed that S.A. and Z.A. are definitely bonded with Bobby A. and Janet and that Emily is not bonded with the children.  Phillips said that Emily told her several times that she did not know how to bond with S.A. and Z.A.  Although Michael testified that the children know him as their father, he said that they are very healthy and happy right now with Bobby A. and Janet.  Janet said that S.A. and Z.A. know about S.G. and ask about her and that she believes that a bond can be formed among the children.  Janet stated that the Kennemores have had no contact with S.G. and that she is not sure how much of a bond there still is between S.G. and Emily’s parents because S.G. was removed from them when she was seven months old 

Regarding the second factor—the children’s present and future physical and emotional needs—several people testified that Z.A. has asthma and Type I diabetes and therefore needs special care.  Bobby A. said that he and Janet received four days of intensive training on how to treat Z.A.’s diabetes while Z.A. was in the hospital.  The children’s counselor, Efrain Rodriguez, testified that Z.A. has anger, fear, and aggression and constantly asks where his grandma is during his visits with Emily.  Rodriguez said that Z.A. struggles with accepting no and that Z.A.’s diabetes could play into his irritability.  The testimony at trial revealed that S.A. needed speech therapy.  Rodriguez testified that S.A. has exhibited signs of sexual abuse and has referred to herself as “sexy.”  He said that S.A. has an unusual amount of aggression and that he is helping her process her aggression.  S.A. has told him that Emily is not nice, and S.A. wets the bed after her visits with Emily.  Rodriguez said that his impression is that S.A. experiences anxiety regarding visits with Emily and has troubling emotions like sadness and anger, which sometimes cause her to regress in her speech.  He is working with S.A. on identifying feelings, decreasing dependency, and increasing self-reliance.  He stated that if he continues to see these behaviors in S.A. and Z.A. in a year or two, he would probably recommend a consultation with a pediatric psychiatrist for possible medications because their level of aggression and defiance is bordering on oppositional/defiant disorder. 

The environmental endangerment and endangering course of conduct discussion above addressed the third, fourth, and eighth factors—the present and future physical and emotional dangers to the children, as well as Emily’s and Michael’s parenting abilities, or lack thereof, and their acts and omissions.  Additionally, Rodriguez testified about the visit that he observed between S.A. and Emily in May 2006.  He said that Emily whispered to S.A. about placement issues regarding S.G., which created parentification with S.A.’s having to be the  grown-up.  Although Rodriguez noted that there was some appropriate interaction between Emily and S.A., he heard Emily admonish S.A. not to call her grandmother “Mom” because she (Emily) is the “Mom.” 

Concerning the fifth factor, Emily and Michael utilized some of the programs offered by CPS but did not take full advantage of them or complete their service plans.  Emily was planning to voluntarily check herself into rehab, and Michael was planning to utilize church to combat his drug and alcohol problems. 

Regarding the parties’ plans for the children—the sixth factor—Emily testified that she is not in a position at this moment to care for her three kids because she wants to put herself in rehab.  Emily would like S.G. to be placed with her parents, and she would like S.A. and Z.A. to be placed with Michael’s parents.  However, she still wants to have contact with her children, and she wants the children to know that she is their mother.  She said that she would consent to supervised visits as long as Janet was not the one doing the supervising. 

Michael testified that he does not want his rights terminated.  However, he stated that, at this time, getting his children back is not an option and that he does not want them back right now because he cannot afford them.  Specifically, he said that he and Emily are not in a position to parent right now because he is in jail, and Emily is financially unable to parent the children.  However, he testified that he loves his children; that it is his intention to work toward getting his life together; that it is his goal to make the children’s separation from him as short as possible; and that if he does not get his life together, he would like Emily to have the opportunity to parent the children.  He would not mind having supervised visits with the children, as long as his family does the supervising, not CPS.  In the meantime, he wants Z.A. and S.A. to live with his parents and S.G. to live with Emily’s parents. 

Judy testified that she wants S.G. to stay with her and to have contact with her siblings.  Judy does not believe that Emily’s and Michael’s parental rights should be terminated.  Instead, she believes that they should still be allowed to have supervised visits with their children. 

Bobby A. explained that it is his and Janet’s plan to adopt the three children, so he asked the court to terminate Emily’s and Michael’s parental rights to all three children and to place all three children with him and Janet.  Janet testified that she believes the siblings should be together as a family and that it is in the children’s best interest to place them with her and Bobby A.

Rodriguez, the licensed professional counselor who has been seeing S.A. and Z.A., testified that he has no reservations about S.A.’s and Z.A.’s placement with Bobby A. and Janet.  He also testified that he would not object to placement of S.G. with Bobby A. and Janet. 

Phillips, the CASA volunteer who observed Emily visiting with the children and who made visits to Emily and Michael’s hotel room as well as to the grandparents’ houses, recommended that S.A. and Z.A. be placed with Bobby A. and Janet and that S.G. be placed with the Kennemores.  However, she admitted that Bobby A. and Janet provide the safest and most relevant placement for the children and that placing S.G. with Bobby A. and Janet would promote the three siblings’ being together. 

Jones, the ongoing caseworker for Emily and Michael’s children, testified that she has no objections to the children’s staying in Bobby A. and Janet’s home.  Jones further testified that she does not think it is in the children’s best interest to have Bobby A. and Janet supervise visits with Michael; instead, she does not think that Michael should have any relationship with his children.  Jokisch testified that is the Department’s plan for S.G. to be placed with the Kennemores.  

Kimberly Bailey testified that she is Mary Jokisch’s supervisor with TDFPS.  She said that it was her recommendation that Emily’s parents’ home study be denied and that S.G. not be placed with Emily’s parents.  Bailey testified that she based her recommendation on the fact that the person who completed the home study had reservations about approving it and recommending the placement due to concerns that Judy was abusing prescriptions.  Bailey explained that the Department has a philosophy of keeping siblings together, but that Bobby A. and Janet do not have a relationship with S.G.  Bailey testified that CPS is asking that S.G.’s parents’ rights be terminated, that the Department be named the permanent managing conservator of S.G., and that Bobby A. and Janet be named as the permanent managing conservators of S.A. and Z.A.  Bailey said that placing S.G. with the Kennemores is in S.G.’s best interest because she will be with family. 

Regarding the stability of the proposed placement—the seventh factor—the evidence demonstrated that Bobby A. and Janet planned to adopt the three children.  The evidence showed that Bobby A. and Janet have been married for a significant period of time, that he has a stable job, and that Janet can stay home with the children.  Although there were some concerns about the children’s being exposed to drugs, the record reveals that Bobby A. and Janet have not tested positive for drugs since the test following the drug raid.  The other proposed placements left lingering questions such as Judy’s possible abuse of prescription medications and whether S.G. would bond with the Kennemores, who had never interacted with her.

Finally, concerning the ninth factor—any excuse for the parents’ acts or omissions—Emily and Michael both raised the lack of transportation and lack of financial resources as an excuse for their failure to complete their service plans.  However, the record revealed that Emily was able to arrange transportation to the visits with her children.  Michael said that he felt that CPS had intentionally sabotaged them by scheduling their services in Dallas even though they lived in Euless.

Although Emily and Michael argue that the children could have remained with Bobby A. and Janet without resorting to termination, the trial court heard testimony from Rodriguez and the CPS workers that termination of Emily’s and Michael’s parental rights was in the children’s best interest.  Giving due consideration to evidence that the fact-finder could have reasonably found to be clear and convincing, and based on our review of the entire record, we hold that a reasonable trier of fact could have formed a firm belief or conviction that the termination of Emily’s and Michael’s parental rights would be in the children’s best interest.  
See In re S.M.L.
, 171 S.W.3d 472, 480 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (holding that clear and convincing evidence existed that termination of father’s parental rights was in child’s best interest where, among other factors, father was incarcerated at time of termination hearing and had a pattern of criminal and violent conduct).  Accordingly, we hold that the evidence is factually sufficient to support the trial court’s best-interest finding.  We overrule both Emily’s and Michael’s first issues.

VII.  Conclusion

Having overruled Emily’s first, second, third, and fifth  issues, we affirm the trial court’s order terminating her parental rights to S.A., Z.A., and S.G.  Having overruled Michael’s first, second, and third issues, we affirm the trial court’s order terminating his parental rights to S.A., Z.A., and S.G. 

SUE WALKER

JUSTICE

PANEL F:  CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

DELIVERED: May 17, 2007

FOOTNOTES
1:
The termination paperwork initially listed this child as “S.D.A.”  However, at the outset of the termination trial, Emily’s attorney mentioned that a trial amendment had been made in December 2005 changing “S.D.A.” to “S.D.G.”  Therefore, we will refer to this child by “S.G.,” despite the fact that the final order failed to reflect the trial amendment.

2:
See
 
Tex. R. App. P.
 47.4.

3:
Emily testified that she was arrested in February 2003 for assault, but she said that the charges were false. 

4:
However, Michael testified that Emily is lying if she says that she is on drugs right now because she does not have money to do drugs. 

5:
She also mentioned taking hydrocodone for carpal tunnel syndrome in her hands.  

6:
Michael also admitted that all of his brothers have drug problems. 

7:
Emily testified that Michael has a drinking problem.  

8:
Emily said that although Michael has completed drug rehabilitation, he continues to struggle with a drug problem.  

9:
Michael testified that the drugs found at his parents’ house were his brother’s.  However, he said that his stepmother had smoked marijuana during his entire life and that at his home there was daily marijuana use similar to a cocktail hour. 

10:
Emily and Michael both testified that he had a beer in his hand, not a crack pipe, when Phillips arrived.